### DURBIN et al. v. BENNETT et al.
### No. 52–D.

District Court, E. D. Illinois.

Sept. 22, 1939.

Smith & Murray, of Centralia, Ill., for plaintiff.

Acton, Acton & Baldwin, of Danville, Ill., Burnside & Burnside, of Vandalia, Ill., R. E. Ausmus, of Centralia, Mo., and L. M. Price, of Columbia, Mo., for defendants.

LINDLEY, District Judge.

The correct answer to the contested issue in this case lies in the legal effect of two mineral deeds executed by William Durbin and his daughter; one for 121 acres to Bennett and the other for 40 acres to Chance.

On September 16, 1936, William Durbin was the owner of record of each of the tracts involved. He had previously executed and delivered to his daughter, Florence May, deeds for each of them, as well as certain other land, but these instruments had not been recorded and were deposited with the First National Bank

of St. Elmo. Durbin and his daughter both testified that the father had expressed some doubt as to the effect of the deeds to the daughter and wished to have them examined by his attorney in Vandalia. Consequently, on September 16, 1936, they went to St. Elmo. The father first attempted to procure the deeds from the bank, but was told that they were the property of his daughter. She thereupon went to the bank and got them. She had thought that they were in three envelopes. As a matter of fact, they were in two. She then went to the office of Kanatzar, a notary public and general utility man, such as is frequently found in the smaller towns of southern Illinois, who apparently had drawn the deeds from the father to the daughter and taken the acknowledgment thereof. He was asked in how many envelopes the deeds had been deposited; he said, two. She testified that thereupon Kanatzar asked her if she and her father wished to sell the royalty or mineral rights upon the farm, subject to the lease then existing in favor of the Carter Oil Company; that she answered in the negative; that he thereupon suggested that there had been some drilling in the remote past which had shown no positive results and that if she could get some money for the royalty, she had better do so.

With the deeds in her possession, she and her father proceeded to Vandalia, some fifteen miles away, the county seat, and, there, to their attorney's office and learned that he was at the court house engaged in a trial. Thither they proceeded, found their attorney busy and saw Kanatzar sitting in the court room. Both testified that he then came out to see them; that he asked the father about selling the mineral rights, saying that he was buying for two men in Oklahoma; that one had sent him some money for royalties in Louden township; that the other was buying mineral rights in another township but had sent no money for that purpose, and that deeds taken for him had to be sent to him for approval. They testified further that the banker came in just then and that he as well as Kanatzar suggested that if they could get some money for royalties, it was wise to sell. They said further that their former aversion to a sale of any part of their royalty rights was overcome by the banker's advice; that thereupon they proceeded to Kanatzar's car where he had a brief case and in it some blank deeds, maps and other documents; that Kanatzar wrote in the deeds, first, the father's name

and then the daughter's as grantors. Kanatzar then asked if they knew the description. They replied that they did not but that the daughter had the deeds with her in sealed envelopes. Thereupon Kanatzar opened the envelopes and read the description. Each of them testified that he said that he did not see any necessity of such a long description as that of the 121 acres; that the descriptions were too long to write in the places where they were to be inserted; that thereupon they each signed blank deeds containing no description and no grantee's name; that Kanatzar gave the father $40 for the deed of one-half the mineral rights in 40 acres, and told him that he would have to procure the $121 from the other purchaser. The deeds were for half of the mineral rights in the respective 40 acre and 120 acre tracts. Thus, if the deeds are valid, they conveyed one-half the royalty rights in each. The two witnesses said that they supposed Kanatzar would insert the descriptions and the names of the grantees but that they did not know that he would. Each denied that he came to the house afterwards to have either of the deeds acknowledged.

Kanatzar's story of part of this transaction was not at variance with that of the plaintiffs. He said, however, that Mr. Durbin, upon the question of royalty, said that "they had made up their minds to sell." He added that the question was submitted to the banker and that the banker advised them to sell. He testified further that he told them he was buying for two men, Bennett and Chance; that he had money from Chance but none from Bennett; that he filled out the deed for the 40 acres in full in long hand at the automobile; that they thereupon signed it; that he took the acknowledgment and placed thereon his seal; that the deed for the 121 acres was not signed at that time; that he took the blank deed to his office and that there his son filled it out with a typewriter, naming the grantors and grantee and inserting the description; that, the same day, shortly after noon, he drove to the farm of plaintiffs, presented the deed to them; that they thereupon signed the same; that he took the acknowledgment and shortly thereafter sent the deed to Bennett and that in return Bennett sent $121 which was deposited to the order of Durbin, the father, who testified that he received and has retained the same. Kanatzar's son testified that, at his father's request, he filled out the deed to the 121 acres; that no grantor's name was signed

to the instrument at that time. This son is at the present time, the owner of a part of what was conveyed to Chance.

Both the father and daughter deny absolutely that Kanatzar came to their house and presented to them the deed to be signed but aver that they signed it while it was still a blank and that Kanatzar was not at their house except, the father says, shortly before, the daughter, sometime after the transaction, when he was looking for violators of the license law. From the testimony of the father and daughter, it appears that each of them expected the name of the grantee and a proper description to be inserted; that at their direction, $40 was paid to the father and $121 later deposited to his order. For two years the mineral deeds remained of record; then this suit was begun to cancel them.

■ The circumstances surrounding this transaction do not strongly appeal to a chancellor. This court has little sympathy with speculators who, when leases of farm land have been made to reputable oil companies, procure from indigent and illiterate grantors, for a nominal consideration, conveyance of a portion or all of the mineral rights of the grantors. They undertake no obligation; they have only to lie back and await the development of the operation by the oil company. Such methods have little appeal to the conscience of a chancellor and in case of evidence of fraud, over-reaching or other circumstances justifying equitable relief, the court will readily cancel the transaction. Nor does the procurement of a broker or agent, such as Kanatzar, appeal strongly to the conscience of the chancellor. Kanatzar is a typical small town notary public who draws deeds, wills and other documents. Such practices frequently lead to litigation, for in drawing deeds and wills, the layman frequently commits errors attorneys would not make and sows the seeds for extended litigation.

■ However, it seems to me the evidence in this case does not justify a cancellation of the conveyances, however favorably for plaintiffs the court may view the same and however much dislike to put the stamp of approval upon the transaction. It is obvious that the grantors expected and, inferentially at least, authorized Kanatzar to insert the names of the grantees and the description, and, even if their story be accepted, this expectation and authorization, coupled with the implied ratification of the transaction for a period of over two years, prevent the court from giving relief.

Illinois courts have been firm in their statement that in every grant there must be a grantee, a grant and a thing granted and that the omission of any one of these essentials invalidates the transaction. Chase v. Palmer, 29 Ill. 306; Whitaker v. Miller, 83 Ill. 381; Gould v. Wenstrand, 90 Ill.App. 127; Westchester Fire Insurance Co. v. Jennings, 70 Ill.App. 539. But Illinois also recognizes the rule that if the grantors execute and deliver deeds with the understanding that there shall be inserted the name of the grantee, the omission of the name is not necessarily destructive of the conveyance. As said in Sirois v. Sirois, 308 Ill. 453 at page 457, 139 N.E. 874, at page 875, "the fact that the grantee's name was in neither deed at the time it was executed did not necessarily vitiate the deed, if the authority was given to insert the name before delivery," and the burden of proof is upon the grantor to prove fraud to avoid validity. Similarly in their reasoning and conclusions are McNab v. Young, 81 Ill. 11; Osby v. Reynolds, 260 Ill. 576, 103 N.E. 556, Ann. Cas.1914D, 387; Root v. Townsend, 186 Ky. 56, 215 S.W. 936; Kittredge v. Cary, 147 Okl. 263, 296 P. 450; 18 Corpus Juris, sec. 57. A full annotation upon the subject of authorized insertions in blank deeds appears in 32 A.L.R. 742 and pages following, 75 A.L.R. 1109; 19 Am.Jur. sec. 88, p. 746.

■ Consequently, though I be willing to accept the story of plaintiffs as the preponderance of the evidence as to what occurred, it seems to me that I cannot, in view of their own testimony, invalidate these deeds. Though Durbin is in his eightieth year, illiterate and evidently of small financial means, and though his daughter is a single woman, uneducated in the law, both of them understood clearly that they were executing a conveyance of one-half of the mineral rights in the two tracts. They intended to convey the same; they expected the deeds to be completed. They received the money, retained the same, and made no move to disturb the transaction until after oil was discovered in the community. I cannot give them relief.

Consequently the bill of complaint must be dismissed for want of equity. Proper decree may be submitted. The foregoing includes my findings of fact and conclusions of law.